FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

OCT 2 7 2011

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

E-filing

| | |
|---|---|
| Masoud Bassidji | * |
| 25 Bamburgh Cir | * |
| APT# 1533S Carborough | * |
| ON, CA | * |
| M1W3W2 | * |
| **Plaintiff** | * |
| | * |
| v. | * |
| | * |
| | * |
| Ocean Star International Inc. | * |
| 1350 Bayshore Hwy Ste 440 | * |
| Burlingame, CA 94010 | * |
| | * |
| OSI Marine Lab Inc. | * |
| 1350 Bayshore Hwy Ste 440 | * |
| Burlingame, CA 94010 | * |
| | * |
| Sanders Brine Shrimp Company LC | * |
| 36 S State Street Ste 1900 | * |
| Salt Lake City UT 84111 | * |
| | * |
| Robert Goe | * |
| 4350 Kirkham St | * |
| San Francisco, CA 94122 | * |
| | * |
| Simon Goe | * |
| 190 Hardwick Rd | * |
| Woodside, CA 94062 | * |
| | * |
| Mark Lamon | * |
| 1350 Bayshore Hwy Ste 440 | * |
| Burlingame, CA 94010 | * |
| | * |
| **Defendants** | * |
| | * |
| | * |

CV 11    5249

JSW

Case No.:

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**COMPLAINT AND JURY DEMAND**

1

Plaintiff, Masoud Bassidji, by and through his attorney, Ali Herischi, seeks to allege, assert, advance, and complain, by and through their Complaint, and allege as follows:

- Federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code §§ 1961, 1962(b), 1962(c), 1962(d), 1964(a), 1964(b), and 1964(c), et.seq.].

- Federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code §§ 1961, 1964(a) federal declaratory relief, et.seq.].

- Federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code §§ 1961, 1964(b) federal declaratory relief, et.seq.].

- Federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"] [Title 18 United States Code §§1961, 1964(a) federal equitable relief, et.seq.].

- Federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code §§ 1961, 1964(b) federal equitable relief, et.seq.].

- Federal Declaratory Judgment Act of 1946 for entry of appropriate and necessary federal declaratory judgment relief under Title 28 United States Code §§ 2201-2202.

- Federal supplemental claims under California law, for monetary relief and equitable relief pursuant to Title 28 United States Code §§ 1367(a)-(b).

allege and complain against Defendants, and each and everyone of them, as follows:

- Ocean Star International Inc., a Utah corporation (hereinafter refereed to as OSI), with corporate office in State of California

- Sanders Brine Shrimp Company L.C., a Utah limited liability company (hereinafter referred to as Sanders)

- OSI Marine Lab Inc., a California corporation and parent company of Ocean Star International Inc. (hereinafter referred to as OSIML), with corporate office in State of California.

- Robert Goe, Resident of California.

- Simon Goe, Resident of California.

- Mark Lamon, Resident of California.

## FEDERAL COMPETENT SUBJECT MATTER JURISDICTIONAL and FEDERAL VENUE ALLEGATIONS

1.    This action is brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* and California state law. The unlawful conduct alleged herein gives rise to claims under 18 U.S.C. §1962 (the "RICO Claims") and California state common law. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 over the RICO Claims and 28 U.S.C. § 1367 over the state law claims.

2.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961.

3

3.      Venue is proper in this District, pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, because each the Defendants resides in, is found in, has an agent in, or transacts business in this District, and because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

4.      This is the first time Plaintiff brought an action against these defendants:

   o      Robert Goe

   o      Mark Lamon

   o      Sanders Brine Shrimp Company L.C., a Utah limited liability company (hereinafter referred to as Sanders)

   o      Ocean Star International Inc., a Utah corporation (hereinafter refereed to as OSI)

   o      OSI Marine Lab Inc., a California corporation and parent company of Ocean Star International Inc. (hereinafter referred to as OSIML)

5.      Plaintiff brought an action against the defendant Simon Goe in 2001. The nature of the claim was a contract claim, enforcement of a Letter of Gurantee, which is unrelated to this Complaint.


## DAMAGES AND STATUTE OF LIMITATION

6.      Plaintiff has been damaged by Defendants conducts as stated in this Complaint and these damages continued from the date of Defendants' misconduct until the date of this Complaint and will continue if no action is taken.

7.      The plaintiff's damages have been caused directly and/or proximately by the Defendants misconducts.

4

8. Defendants properties with value of more than one million US Dollars are still in Iran's Customs and Plaintiff has been and is continuing to pay penalties for Defendant's properties left in Iran.

9. Defendants equipments are left in Urumieh Lake and Plaintiff has been paying the fees associates to the location used by Defendants equipment to the authorities in an amount exceeding $500,000.00.

10. Defendant's obligations to Iran Fishery Company were not satisfied and consequently the Plaintiff is personally being held liable for Defendants' obligations for a sum of money in the amount of over two million US Dollars.

11. Due to Defendants unsatisfied obligations to different Iranian Governmental entities, the Plaintiff was held criminally liable under different Iranian laws.

12. Damages caused by Defendants will continue until Plaintiff satisfies all of the obligations left unanswered by Defendants.

13. At the time of this Complaint, Plaintiff suffered direct damages in an amount exceeding $3,000,000.00.

14. At the time of this Complaint, Plaintiff suffered consequential damages in an amount exceeding $1,500,000.00.

15. At the time of this Complaint, Plaintiff is still responsible for Defendants' obligations in an amount exceeding $3,000,000.00.

16. Plaintiff has been suffering continuous injuries caused by violations of 18 U.S.C. § 1962, therefore Plaintiff is filing the Complaint within the RICO's statutes of limitation.

5

## FACTS COMMON TO ALL COUNTS

17.     Mr. Simone Goe, a dual citizen of the United States and Taiwan, who was at that time the Chairman of the Board of Sanders Brine Shrimp Co., L.C. , (a limited partnership company located in the United States), and the Vice President of Ocean Star International, Inc., (a corporation also located in the United States, that produced different types of feeds for aquarium fish, reptiles and garden pond fishes), started researching salt lakes around the world in order to launch a project for harvesting Artemia. Brine Shrimp (Artemia) cysts are high demand products that are used to feed larval stages of many fishes and shrimp species that are in turn consumed by humans. The cysts are hatched and the resulting baby brine shrimp (nauplii) are used as feed for fish and shrimp.

18.     The Great Salt Lake in Utah has regularly been used as the primary source of harvesting such cysts. However, the demand for such Artemia had begun to surpass the supply, thus provoking Mr. Simone Goe and his comrades to start researching other salt lakes around the world that would be good potential areas to harvest such Artemia.

19.     At the instruction of Mr. Simone Goe, Mr. Ahmet Arsan, a citizen of Turkey and an agent of OSI, started researching the region of Iran, which was thought to have been a good prospective region for such cultivation.

20.     In a letter dated July 6, 1998, from Dave Kuehn (the harvest manager for Sanders Brine Shrimp Company) to Ihsan Kesmen (a citizen of Turkey who later became an employee of KEL as is evidenced by an employment contract dated November 30, 1998), Mr. Kuehn expresses his company's interest

6

in obtaining information on the potential production of Artemia cysts in Urmia lake in Iran. He goes on to instruct Mr. Ihsan on how to properly obtain samples of Artemia cysts from the shorelines of the lake and how to then properly send the samples via courier in order to determine their "future business ventures in Iran." The letter also describes another individual, Mr. Ahmet Arsan, who is to be Mr. Kesmen's primary point of contact for his trip to Iran.

21.     Approximately three months later, in a fax dated November 25, 1998 (by Mark Lamon, vice president of OSIML to Simon Goe, Ahmet Arsan, David L. Alldredege, and Ihsan Kesmen) Mr. Lamon reports the results of a meeting that was held with Mr. Kesmen and Mr. Ahmet concerning the conditions in Iran after Kesmen's visit to the area. The fax lays out the following notes based on Mr. Kesmen's findings:

- "Ihsan gave an excellent review of the situation in Iran for brine shrimp eggs."

- "Its development as a brine shrimp egg source cannot be ignored. I think we need to proceed with a proposal to the Iranian Fishery Co. (IFC) as soon possible. We need to decide who will do this."

- "Two government groups will control the harvesting of Artemia from Lake Urmia, Iran...Iranian Fishery Co. (IFC) [and] the Natural Resource Protection Administration (NRPA)..."

- "So far no licenses have been issued by the IFC to harvest brine shrimp cysts...however, several have applied."

7

- "Under current Iranian law foreign companies are only allowed to own 49% of an Iranian company…we would have to open a new company in Iran and use Ihsan's company in Iran and a non-USA company (probably Ahmet Arsan's company or a new company in Turkey) to run the company."

- "We are trying to find out what we can do with the frozen adult biomass. Maybe we can export it to Europe of the USA (indirectly after further processing in Turkey)…Remember the USA has an embargo in place for Iranian products at this time."

- "IFC has been told that Sanders and OSI will contribute US $50,000 for "research" if they will help us get a license."

- "Regarding bribes…taking of bribes is punishable by death in Iran. So care must be given when offering a bribe or probably for that matter giving one. Because of the high penalty, it takes a lot of trust to get someone to work with you."

22.  In a fax dated November 27, 1998 (from Mr. Lamon to Mr. Arsan and Mr. Kesmen, cc'd to Simon Goe and David Alldredge) Mr. Lamon discusses the results of those samples that had been collected and shipped by Mr. Kesmen and what the next steps should be in pursuing the finding of the results. The fax stated the following:

- "Mr. Guo emphasized to Simon that the species of brine shrimp living in Ormia Lake is bisexual (both male and female members)…As a result of this information Simon really wants to push forward

8

immediately to obtaining cysts from Iran...I think the following steps need to be taken to get things started...1.) Immediately set up a company in Turkey via Ahmet...2.) Set up the company in Iran via Ihsan. The funds can be transferred to that company from the Turkish company."

- "Write and submit to Shelot (Iranian Fishery Co.) the proposal they requested as soon as possible. I will have David Alldredge fax over a copy of the proposal we did for the Karabogazgol cysts in Turkmenistan to both you and me. We can use that for a base proposal."

23. In accordance with the November 25th and November 27th fax, Kingdom Enterprise Ltd (KEL) (a Hong Kong limited liability company, established on November 18, 1998, with offices in Kowloon, Hong Kong, P.R. China), registered a branch in Tehran-Iran in order to be the "face" of the defendants, as a non-USA company, and to be the missing link that would be needed to keep the U.S. companies (OSI, Sanders and OSIML) out of the scenario.

24. KEL's sole purpose was to serve as the middleman between the Defendants and Iranian officials in charge of issuing harvesting rights.

25. There are various documents supporting the link between KEL to all three of the aforementioned U.S. companies. Included among these documents are the following Agreements that show the amount of power and control that the U.S. companies had over KEL. All of the following Agreements were signed and

9

authorized by Simone Goe. Furthermore, these documents specifically stated that these U.S. companies would provide KEL with "[t]echnology on harvesting and processing...equipment used for harvesting...information on marketing...knowledge as needed to the management of KEL for day to day operations...[and] financially support KEL during its operation." These documents are titled as follows:

- *The Licensing Agreement for Harvesting/Processing Technology, Equipment Transfer, Marketing, Internal Management, and Financial Support between OSI and KEL*

- *The Agreement for Technology Transfer, Marketing, Internal Management, and Financial Support between OSIML and KEL*

- *The Licensing Agreement for Harvesting and Processing Technology between Sanders and KEL*

26.  Upon establishing KEL, the following documents were sent in a letter dated December 9, 1998, from Mr. Lamon to Mr. Arsan. The letter contained a copy of the following items:

A. "Biomass proposal with a price of US $1,800/kg in case you need to use it."

B. "Biomass proposal with a blank price if you can bargain down the price."

C. "Cyst proposal."

D. "Business Plan. Note I have tentatively called the company Sunrise Artemia. However, you and Ihsan can name it

10

something else if you have a better name. Just don't use

Iran or Lake Urmia in the name."

E. "Joint venture agreement."

F. "Initial capital investment with details."

G. "Initial capital investment generalized."

H. "Time schedule."

I. "Licensing agreements for reference."

J. "Financial plan for the first year."

K. "Power of attorney."

27.    The December 9, 1998 letter goes on to explain that "Simon ha[d]
already looked over all of the documents and [was] satisfied." Mr. Lamon then
briefly makes the following notes about some of the documents that were attached
to the letter:

- "Regarding the two biomass proposals...Simon has signed
  both...make sure to leave only one form with the Iranians. We don't
  want 2 proposals floating around confusing them or possibly allowing
  them to try to sell us 200MT."

- "One document that is missing and we don't want to show to IFC is a
  Management Agreement for the company in Iran. It is critical that
  Kingdom Enterprises Ltd. Has control of the joint venture company
  even though the major stock holder is an Iranian company. The Iranian
  company basically needs to be a cover for us, and have no rights in the
  management or operation of the joint venture. It is best that they don't

11

even know the business. We don't want to train them to start another company on their own and compete with us."

- "[T]here needs to be a document in the joint venture company that allows Kingdom Enterprise Ltd. to buy back shares at a very low price from the Iranian company if that becomes allowable under Iranian laws. Simon doesn't mind giving the Iranians some money, but not a huge amount for doing nothing and investing nothing in the business. They are basically only giving a name to the deal and solving some local problems."

28. Subsequently after forming the KEL branch in Iran, Mr. Ihsan Kesmen, at the direction of Mr. Simone Goe, started corresponding with Iran Fishery Company in order to submit a bid on the rights to begin harvesting Artemia in Lake Urumia in Iran.

29. Shortly thereafter, Mr. Simone Goe and Mr. Ihsan Kesmen wrote a business proposal and plan, on behalf of KEL, for the harvesting of Artemia in Lake Urumia in Iran. In the business plan they specified that Sanders Brine Shrimp Co., L.C. would license its harvesting and processing technology to KEL, and Ocean Star International, Inc. would consult KEL on management and marketing issues.

30. Upon submitting their proposal and bid, on July 3, 1999, Mr. Ihsan Kesmen received a letter from Iran Fishery Company (Shilat Trading Corporation), an Iranian entity responsible for Iran's fishery, stating that foreign companies would not be considered for such rights. Although KEL had a branch

12

in Iran, it was deemed a foreign company, thus preventing it from being able to obtain the sought after harvesting rights that Mr. Simone Goe had initiated to obtain.

31. In order to circumvent Iranian Law, Mr. Simone Goe decided to create a shell company that could publicly apply for exploitation rights and thus allow him to continue his efforts of acquiring harvesting opportunities.

32. As a result, on or around July 7, 1999, Seyd Sayyed Limited, "SSL" was registered in Iran by Karim Arshian under the supervision of Mr. Simone Goe.

33. Immediately thereafter, on July 8, 1999, an agreement was formed between KEL and SSL, entitled "Contract for Management, Financial, Technological, and Scientific Support." The Agreement specifically stated that KEL would provide the following to SSL:

- "Managing and arranging of the relationships with the local authorities for and on behalf of SSL."

- "Preparation and maintenance of accounting records, and balance sheet of SSL."

- That "SSL agrees that the managing director and financial director of SSL to be appointed by KEL, for a period of this contract."

34. KEL then hired Mr. Karim Arshian and appointed him as the managing director of SSL and granted him 100% of the shares of SSL in accordance with the abovementioned Agreement.

13

35. In a letter dated September 26, 1999, Robert Goe admittedly explains, "[w]e have shipped 10 boats and 8 containers of equipments and supplies valued at over several millions U.S. Dollars…" Robert Goe and others helped arrange the details and import of the aforementioned items through a company called Spring Season Auto Spare Parts LLC. Many fraudulent acts took place in order to get these items into Iran including, but not limited to the use of bribery, changing information relating to the Certificate of Origin, violating embargo, and keeping Customs officials on payroll.

36. During this time, a large amount of money was transferred from OSI to SSL. These funds were sent by Havala to Iran through the black market in Dubai. KEL, with Simon Goe's authorization, distributed the money among other employees and paid for the illegal activities in pursuit of obtaining the exclusive rights to harvest Artmeia from Lake Urmia. Such activities included bribes to different Board of Directors (BOD's) and Iranian officials. Among the many that were bribed, the following individuals are those that have been identified as having received such bribes:

a. Mr. Mohammad H., the Husband of Iran's Vice President and head of the Environmental Agency

b. A Member of the Parliament

c. A Mayor

d. Environmental Agency officials

e. Officers of Business Registration

f. Members of the Intelligence Ministry

14

g.  David Theodore Belfield[1], or A/K/A Hassan Abdulrahman

37.    Mr. Simone Goe paid or facilitated the payment of bribes in the amount of at least one million U.S. dollars to, M. E.'s husband, Mohammad H, Iranian officials who were among the hostage takers at the US Embassy in Iran in 1979. This money was paid in exchange for Ms. E's cooperation and efforts to obtain harvesting rights, by and through his wife's position of power, on behalf of defendants.

38.    In a fax dated March 29, 2000, it describes the "consultant fees," aka bribed transactions that had been made to seven BOD members that had generally remained unidentified in previous correspondences. The BOD members were often referred to as BOD 1, BOD 2, and so on, to protect their identities since they were receiving bribes. This particular fax however, identifies five of the seven BOD members by name and shows the monetary transactions that were taken. It includes the dates and amounts of each transaction to the following BOD members:

BOD #1- Mohammad H.

- May 19- 300,000,000 Rials

- May 19- 50,000,000 Rials

---

[1] "The man, who now uses the name Hassan Abdulrahman, was formerly known as known as Dawud Salahuddin — which is the name he took at the age of 18 when he converted to Islam and first got involved with Islamist radical movements in the United States. Before that he was David Theodore Belfield, the son of a churchgoing Baptist family from Bay Shore, Long Island.

Mr. Abdulrahman first worked on behalf of the Islamic Republic of Iran when it was little more than a year old. In 1980, he was a security guard at an Iranian diplomatic office in Washington when he accepted an assignment from the revolutionary government of Iran to assassinate a former member of the Shah's regime living in exile in Bethesda, Md."
"Just Another American Hit Man, Actor and Journalist Living in Iran" By Robert Mackey, The New York Times, September 16, 2009.

15

- May 19- 650,000,000 Rials

- June 22- 500,000,000 Rials

- July 11- 20,000,000 Rials

- July 18- 936,000,000 Rials

- Aug. 19- 5,000,000 Rials

- Aug. 24- 80,000,000 Rials

- Aug. 30- 280,000,000 Rials

- Aug. 31- 1,523,200,000 Rials

- Sept. 20- 525,000,000 Rials

- Sept. 26- 1,000,000,000 Rials

- Oct. 9- 1,278,508,960 Rials

- Nov. 12- 42,400,000 Rials

- Dec. 2- 400,000,000 Rials

## BOD #2- Hossein

- July 11- 100,000,000 Rials

- July 18- 50,000,000 Rials

- July 21- 458,000,000 Rials

- Nov. 12- 87,000,000 Rials

## BOD #3- Hamid

- July 4- 10,000,000 Rials

- July 18- 10,000,000 Rials

- July 18- 5,000,000 Rials

## BOD #4- Karim

16

- Aug. E- 458,000,000 Rials

- Aug. L- 448,000,000 Rials

BOD #5- Customs

- Nov. 12- 300,000,000 Rials

- Feb. 14- 200,000,000 Rials

BOD #6- Unnamed Individual

- Feb. 8- 10,000,000 Rials

BOD #7- Unnamed Individual

- Feb. 7- 305,000,000 Rials

Totaling to 10,631,108,960 Rials which, equates to approximately $1,328,888 in U.S. currency.

  39.  The following documents contain additional monetary transactions that were given to BOD's by the RICO defendants. The information included contains the title of the document, the BOD involved in the monetary transaction, the date and amount of money given to them along with any notes that may have been made next to their transactions:

Outgoing of Funds (Report Date: 9/9/99)

BOD #1

- July 29- 912,000,000 Rials

- Aug 31- 3,136,000,000 Rials (BOD1 loan 170K)

BOD #2

- July 21- 900,000,000 Rials (Karim-50K, BOD2-50K)

Daily Transaction Statement, Kingdom Enterprise Ltd. (Report Date: 08/09/1999)
BOD #1

17

- July 12- 1,520,000,000 Rials

BOD #2

- July 12- 100,000,000 Rials

BOD #3

- July 12- 10,000,000

Bank Tejarat Account Statement (04-Sep-99)

BOD #1

- May 29- 300,000,000 Rials

- May 30- 50,000,000 Rials

- June 6- 650,000,000 Rials

BOD #2

- June 27- 50,000,000 Rials

Consultant Account Records (BOD1)

BOD #1

- June 3- 650,000,000 Rials

- Aug 31- 1,523,200,000 Rials (loan)

BOD Account Records

BOD 3: Hamid (Sohrabi)

- July 11- 10,000,000 Rials

KEL-IRAN, KARIM'S Bank A/C Statement IN Rials (From 15/12/1999 To 31/01/2000)

BOD #1

- Nov 13- 42,400,000 Rials

- Dec 1- 400,000,000 Rials

BOD #2

18

- Nov 13- 87,000,000 Rials

BOD #5

- Nov 13- 300,000,000 Rials

KEL-IRAN, KARIM'S Bank A/C Statement IN Rials (From 12/05/1999 To 15/12/1999)

BOD #1

- Oct 19- 1,278,508,960 Rials

40. In an email dated February 8, 2000, from Artin Ohanjanians to Robert Goe, Artin spells out the circumstances surrounding KEL's book keeping methods and tax consequences. The email states, "[w]e transferred money from non regular way and exchange it in black Market, because of this reason we couldn't record these entries as due to KEL...we record these entries as debts financing from Mr. Karim and SSL company in our books." The email then goes on to state that, "[i]f we transferred money through the banking system...and settled all the debts to third parties and record these due to KEL, maybe in few percent we can succeed to escape from tax or take some discount."

41. Meanwhile, most of SSL's decisions were made by Simone Goe, Robert Goe, and Mark Lamon without Mr. Arshian's knowledge. In most of the emails and fax correspondence between Mr. Simone Goe and Mr. Mark Lamon, Mr. Geroge Wang and Mr. Ahmet Arsan and other employees of Mr. Goes', residing in the U.S., Iran and Hong Kong, Mr. Goe was the sole director of the project, whereby giving instructions and orders to others while he himself made the final decisions on all of the transactions.

19

42.    In order to fully control SSI, Mr. Simone Goe asked Mr. Arshian to provide him with a blank signed copy of the company's letter head. Such signed paper would allow Mr. Goe to completely act on his own without even consulting Mr. Arshian.

43.    Mr. Arshian refused to provide such signed paperwork, but introduced Ms. Sepideh Sadeghi and Darya Keshavarzi (secretary and bookkeeper of SSL) as his substitute. Ms. Sadeghi and Ms. Keshavarzi replaced Mr. Arshian and each received 48% of the shares of SSL.

44.    Mr. Arshian and was allowed by Simon Goe to retain 4% of the shares under his own name. Yet, Mr. Goe asked Mr. Arshian to retain his position as the managing director of SSL, thus making him individually responsible in person for all of SSL's undertakings, according to Iranian Laws.

45.    On August 23, 1999, SSL submitted an application for $1,050,000 USD to Iran Fishery Company (Shilat) to participate in the Artemia tender.

46.    On October 25, 1999, Mr. Simone Goe authorized and signed the transfer of 1,049,996,07 of German Mark worth $1,050,000 USD to Iran Fishery Company (Shilat). The bank account information is as follows: Europaish Iranische Handels Bank AG-Hamburg-P.O.B. 10 13 04-20008-Hamburg-Account number: 65.

47.    In addition, Mr. Simone Goe signed and authorized another transfer of funds to the Iranian Islamic Republic of Shipping Co. in the sum of $52,000.

20

48. All of the aforementioned companies, consisting of: KEL, OSI, Sanders and later SSL were strategically orchestrated by Simone Goe, Robert Goe and Mark Lamon to be intertwined with one another in order to serve a common goal and to ultimately benefit the defendants by obtaining harvesting rights. The start up companies, including KEL and SSL, were not only organized, controlled, and managed by Simon Goe, Robert Goe and Mark Lamon, but they were also financially supported and funded through OSI, Sanders and OSIML.

## RICO PERSONS [RICO TITLE 18 UNITED STATES CODE § 1961(3)]

49. Plaintiff Masoud Bassidji is, and at all times material herein was, a citizen of Canada and a resident of Toronto, Canada. Plaintiff is engaged in activities that affect federal interstate and/or foreign commerce. Plaintiff Bassidji is a 'person,' as that term is defined pursuant to Section 1961(3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ['RICO'].

50. Plaintiff alleges that, at all times material herein that Simon Goe is an agent, employee, representative, director, officer, and chairman of the board of Sanders Brine Shrimp Company ("Sanders") (a limited liability company duly organized and existing under the general laws of the state of Utah, and having a principal place of business in Ogden, Utah. Sanders is in the business of producing Artemia and holds the patented technology used to harvest and process brine shrimp eggs.), and an agent, employee, representative, director, officer, and vice president of Ocean Star International Inc. ("O.S.I.") (a Utah corporation having a principal place of business in Snowville, Utah). Plaintiffs further allege

21

that Simon Goe manages, controls, and directs the business activities of Sanders and OSI through its principal place of business, and such activities affect federal interstate and/or foreign commerce. Simon Goe is a 'person,' as that term is defined pursuant to Section 1961(3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ['RICO'].

51.     Plaintiff alleges that, at all times material herein that Robert Goe is an agent, employee, representative, and officer of Sanders Brine Shrimp Company ("Sanders") (a limited liability company duly organized and existing under the general laws of the state of Utah, and having a principal place of business in Ogden, Utah. Sanders is in the business of producing Artemia and holds the patented technology used to harvest and process brine shrimp eggs), and an agent, employee, representative, officer, incorporator and director of Ocean Star International Inc. ("O.S.I.") (a Utah corporation having a principal place of business in Snowville, Utah). Plaintiffs further allege that Robert Goe manages, controls, and directs the business activities of Sanders and OSI through its s principal place of business and such activities affect federal interstate and/or foreign commerce. Robert Goe is a 'person,' as that term is defined pursuant to Section 1961(3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ['RICO'].

52.     Plaintiff alleges that, at all times material herein that Mark Lamon is an agent, employee, representative, director, officer, and vice president of Ocean Star International Inc. ("O.S.I.") (a Utah corporation having a principal place of business in Snowville, Utah). Plaintiffs further allege that Mark Lamon

22

manages, controls, and directs the business activities of OSI through its principal place of business and such activities affect federal interstate and/or foreign commerce. Mark Lamon is a 'person,' as that term is defined pursuant to Section 1961(3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ['RICO'].

53. Plaintiff alleges that, at all times material herein that Sanders Brine Shrimp Company ("Sanders") is a limited liability company duly organized and existing under the general laws of the state of Utah, and is in the business of producing Artemia and holds the patented technology used to harvest and process brine shrimp eggs. Plaintiffs further allege that Sanders maintains its principal place of business within the City of Ogden, State of Utah, and such activities affect federal interstate and/or foreign commerce. Sanders is a 'person,' as that term is defined pursuant to Section 1961 (3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ['RICO'].

54. Plaintiff alleges that, at all times material herein that Ocean Star International Inc. ("O.S.I.") is a corporation duly organized and existing under the general laws of the state of Utah. Plaintiffs further allege that OSI maintains its principal place of business within the City of Snowville, State of Utah, and such activities affect federal interstate and/or foreign commerce. Sanders is a 'person,' as that term is defined pursuant to Section 1961 (3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ['RICO'].

55. Plaintiff alleges that, at all times material herein that OSI Marine Lab Inc ("O.S.I.M.L"), the parent company of Ocean Star International Inc., is a

23

corporation duly organized and existing under the general laws of the state of California. Plaintiffs further allege that OSIML maintains its principal place of business within the State of California, and such activities affect federal interstate and/or foreign commerce. OSIML is a 'person,' as that term is defined pursuant to Section 1961 (3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ['RICO']. OSI Marine Lab Inc., a California corporation and

56.     Plaintiff alleges that each and every RICO person that is specifically identified and named as a RICO defendant is liable as a principal pursuant to Title 18 United States Code §§ 2(a)-(b) and that each and every RICO person that is a RICO defendant is liable as a co-conspirator pursuant to Title 18 United States Code § 371.

## RICO ENTERPRISE ALLEGATIONS [TITLE 18 U.S.C. § 1961(4)]

57.     Plaintiff alleges that defendants have violated (and continue to violate) the substantive provisions of 18 U.S.C. § 1962 in that (1) the acts of the Individual Defendants and Company Defendants, as herein mentioned, (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly participated in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce, and defendants' violation of said section 1962 caused injury to the Plaintiff, Masoud Bassidji by reason of said violations of section 1962.

24

58. Plaintiff alleges that the instant case concerns a massive racketeering scheme involving the aforementioned RICO Defendants that make up the Artemia Enterprise, which appears to conduct legitimate business, but which has regularly perpetrated unlawful activities as a means to obtain access rights to permit the exploitation of Artemia reserves in Lake Urumia in Iran. Plaintiff alleges that the "Artemia Enterprise" is a RICO "enterprise," as that term is defined pursuant to Title 18 United States Code § 1961 (4) of the Racketeer Influenced and Corrupt Organizations Act of 1970.

## A. *THE ARTEMIA MANAGEMENT STRUCTURE*

59. The Artemia Enterprise has a pyramid-like management structure whereby Simon Goe, who is at the top of the pyramid, is the person whom directs all of the enterprise's legitimate and illegitimate business activities. These activities are directed through various subordinates from different companies located in various regions. To implement his directives, Simon Goe relies upon his upper management team, which includes Robert Goe, Mark Lamon, and others.

60. Plaintiff alleges that the Artemia Enterprise is managed, directed, and controlled by Simon Goe, Robert Goe, and Mark Lamon. Plaintiff alleges that Simon Goe, Robert Goe, and Mark Lamon collectively direct and control the affairs of the Artemia Enterprise, including the solicitation of participants for the purpose of obtaining their assistance in the formation and implementation of the Iranian shell company that was established as a front for Defendants unlawful

25

acts. Plaintiffs allege that the Artemia Enterprise is engaged in activities that affect federal interstate and/or foreign commerce.

## B. *THE ARTEMIA FRAUD SCHEME*

61. The instant case concerns a massive racketeering scheme involving the aforementioned Defendants in an attempt to obtain access rights to permit the exploitation of Artemia reserves in Lake Urumia in Iran.

62. After Iranian officials refused to grant such rights to Ocean Star International, since it was deemed a foreign entity, Defendants took part in a pattern of planned and thought out racketeering predicate acts, whereby defendants invested in, and operated, and acquired control of various other entities, including an Iranian entity that Defendants established, in continuing fraudulent transactions together with others who were aware of, and acted in furtherance of one another's actions with the intent of helping circumvent Iranian laws concerning the denial of granting exploitation licenses to foreign entities.

63. These acts were committed through shell corporations that were established as a means to avoid detection and to conceal unlawful acts committed by Defendants, thus allowing Defendants to obtain exploitation rights through what appeared to be an "Iranian" entity, which was in reality being run and controlled by Defendants.

64. Defendants established a scheme built on misrepresentations, fraudulent documentations, and false statements relating to the legitimacy of

26

"KEL" and "SSL," which were the shell corporations established by Defendants and presented to Iranian officials as bona fide Iranian corporations.

65.    These misrepresentations perpetrated a scheme to defraud and to obtain access rights to permit the exploitation of Artemia reserves in Lake Urumia in Iran by means of false or fraudulent pretenses.

66.    As a result of Defendants' conduct and conspiracy, the Defendants caused direct and consequential damages to Plaintiff.

# RICO PATTERN OF RACKETEERING ACTIVITY ALLEGATIONS [TITLE 18 U.S,C. § 1961(5)]

67.    Plaintiff alleges that the Individual Defendants Simon Goe, Robert Goe, and Mark Lamon, at all material times set forth herein, participated in the operation and management of the RICO enterprise identified herein by engaging in a pattern of racketeering activity in violation of the RICO statute in that the Individual Defendants, Simon Goe, Robert Goe, and Mark Lamon and Company Defendants, Sanders, OSI and OSMIL, committed at least two related predicate acts, violating the criminal statutes listed in 18 U.S. C. § 1961 (1) (B), the last of which acts occurred within ten years after the commission of a prior act of racketeering.

68.    Plaintiff alleges that defendants engaged in the above activities and/or conduct that constitutes the following form of "racketeering activity," as that term is defined pursuant to Title 18 United States Code § 1961(1)(B) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"]:

27

A. Federal Principal and Aider and Abettor Liability: Title 18 U.S.C. §2;

B. Federal Mail Fraud: Title 18 U.S.C. §1341;

C. Federal Mail Fraud *re:* Aiding and Abetting: Title 18 U.S.C. §1341;

D. Federal Mail Fraud *re:* Conspiracy: Title 18 U.S.C. §1341;

E. Federal Wire Fraud: Title 18 U.S.C. §1343;

F. Federal Wire Fraud *re:* Aiding and Abetting: Title 18 U.S.C. §1343;

G. Federal Wire Fraud *re:* Conspiracy: Title 18 U.S.C. § 1343;

H. Federal Intangible Personal Property Right Deprivation: Title 18 U.S.C. §1346;

I. Federal Racketeering: Title 18 U.S.C. §1952;

J. Federal Racketeering *re:* Aiding and Abetting: Title 18 U.S.C. §1952;

K. Federal Racketeering *re:* Conspiracy: Title 18 U.S.C. §1952;

L. Federal Money Laundering: Title 18 U.S.C. §1956;

M. Federal Money Laundering *re:* Aiding and Abetting: Title 18 U.S.C. § 1956;

N. Federal Money Laundering *re:* Conspiracy: Title 18 U.S.C. § 1956;

O. Federal Criminally Derived Property: Title 18 U.S.C. §1957;

P. Federal Criminally Derived Property *re:* Aiding and Abetting: Title 18 U.S.C. §1957; and

Q. Federal Criminally Derived Property *re:* Conspiracy: Title 18 U.S.C. §1957.

69.     Plaintiffs allege that above activities and/or conduct engaged in by

Defendants constituted a "pattern of racketeering activity," as that term is defined

pursuant to Title 18 United States Code § 1961 (5) of the Racketeer Influenced

and Corrupt Organizations Act of 1970 ["RICO"].

## CLAIMS FOR RELIEF

### I. FIRST CLAIM FOR RELIEF:

**For Commission of Primary Contravention of RICO Section 1962 (b) of the Racketeer Influenced and Corrupt Organizations Act of 1970] ["RICO"] [Title 18 United States Code §§1962(b) [Against All Defendants]**

28

70.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein and further allege:

71.    The RICO Defendants are (a) persons (b) acting with the necessary mens rea (c) received income (d) through a pattern of racketeering activity (e) acquired or maintained (f) any interest in (g) or control of (h) an enterprise (i) engaged in or affecting interstate or foreign commerce (j) resulting in injury to the plaintiff's business or property (k) by reason of (l) the Defendant's acquisition or maintenance of the interest in, control over, the enterprise in violation of 18 U.S.C.A. §1962 (b).

72.    Plaintiffs allege that similarly situated victims, including members of the general public, sustained losses by reason of the conduct alleged against defendants.

## A. RICO 18 U.S.C.A. §1961(1)(B) Predicate Offense Contraventions

A. Federal Principal and Aider and Abettor Liability: Title 18 U.S.C. §2;

B. Federal Mail Fraud: Title 18 U.S.C. §1341;

C. Federal Mail Fraud *re:* Aiding and Abetting: Title 18 U.S.C. §1341;

D. Federal Mail Fraud *re:* Conspiracy: Title 18 U.S.C. §1341;

E. Federal Wire Fraud: Title 18 U.S.C. §1343;

F. Federal Wire Fraud *re:* Aiding and Abetting: Title 18 U.S.C. §1343;

G. Federal Wire Fraud *re:* Conspiracy: Title 18 U.S.C. § 1343;

H. Federal Racketeering: Title 18 U.S.C. §1952;

I. Federal Racketeering *re:* Aiding and Abetting: Title 18 U.S.C. §1952;

J. Federal Racketeering *re:* Conspiracy: Title 18 U.S.C. §1952;

K. Federal Money Laundering: Title 18 U.S.C. §1956;

L. Federal Money Laundering *re:* Aiding and Abetting: Title 18 U.S.C. § 1956;

M. Federal Money Laundering *re:* Conspiracy: Title 18 U.S.C. § 1956;

N. Federal Criminally Derived Property: Title 18 U.S.C. §1957;

O. Federal Criminally Derived Property *re:* Aiding and Abetting: Title 18 U.S.C. §1957; and

P. Federal Criminally Derived Property *re:* Conspiracy: Title 18 U.S.C. §1957.

### B. RICO 18 U.S.C.A. §1961(5) Pattern of Racketeering Activity

73.     In connection with the fraudulent schemes set forth above, and to further their illegal aims, the RICO defendants have engaged in numerous acts of "racketeering activity," and each of the RICO defendants has aided and abetted each other and other coconspirators in committing these multiple predicate acts of racketeering including, but not limited to:

### I. Money Laundering. 18 U.S.C. § 1956(a)(1)

74.     Whereby the RICO defendants knew that the property was involved in certain financial transactions representing the proceeds of some form of unlawful activity, the RICO defendants conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or did so knowing that the transactions were designed in whole or in part to avoid a transaction-reporting requirement under state or federal law.

75.     Plaintiff further alleges that the RICO defendants facilitated and furthered the commission of the RICO primary contraventions alleged herein

above as is evidenced by the following acts of unlawful activities as is defined in

18 U.S.C. § 1956(c)(7):

*(A.) Money Laundering of Proceeds of Offenses against Foreign Nations.* 18 U.S.C. § 1956(c)(7)(B)(v)(II).

76. The RICO defendants knew that the proceeds of transactions with money launderers and others engaged in criminal conduct represented the proceeds of specified unlawful activity, including without limitation offenses with respect to which would be considered smuggling and/or exporting control violations. Including:

- *Exporting 10 boats from the US to Iran.*

- *Exporting cars from the US to Iran.*

- *Exporting equipment, supplies and parts from the US to Iran.*

77. The RICO defendants have laundered, and conspired to launder, the proceeds of various offenses covered by the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (adopted November 21, 1997, entered into force in the United States February 15, 1999), including for example the proceeds of transactions obtained or continued as a consequence of payments, direct and indirect, to foreign public officials.

78. As alleged above, RICO defendants made payments to BOD members, some of whom were foreign public officials, and retained or obtained benefits as a result of each of these payments.

*(B.) Money Laundering of Proceeds of Violations of Foreign Corrupt Practices Act.* (18 U.S.C. § 1956(c)(7)(D).

31

79.     In general, the Foreign Corrupt Practices Act (FCPA) makes it unlawful for defendants, or any officer, director, employee, or agent thereof, to pay or promise to pay money or any thing of value to any foreign official for purposes of influencing any act or decision of the foreign official in his or her official capacity, inducing such official to do or omit to do any act in violation of the lawful duty of such official, or securing any improper advantage, or inducing such foreign official to use his or her influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist defendants in obtaining or retaining business for or with, or directing business to, any person. "Foreign official" means any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of such entities.

80.     The RICO defendants, acting through intermediaries, provided money or things of value to foreign Iranian officials for the purposes of bribing these officials for inside information as to the proposal and bidding process, to obtain assistance in evading competition from other competing companies, obstructing oversight of other officials in order to secure defendants conduct, and thereby permit their business to continue and eventually "win" the bid for exploitation rights.

**II. Money Laundering Outside of the United States.** 18 U.S.C. § 1956(a)(2)

32

81. Whereby the RICO defendants transported, transmitted, and/or transferred monetary instruments or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, or did so knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or to disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity, or to avoid a transaction-reporting requirement under state or federal law. By such conduct, the RICO defendants engaged in financial transactions within the meaning of 18 U.S.C. § 1956(c)(4).

82. The RICO defendants knew that the money transfers and funds sent to/ from Hong Kong and Iran to/from the United States, to pay for the sale and shipment of ten boats, car parts, equipment, and payroll, represented the proceeds of specified unlawful activity, including without limitation wire fraud, mail fraud, and violations of the Travel Act.

83. Plaintiff further alleges that the RICO defendants facilitated and furthered the commission of the RICO primary contraventions alleged herein above by making the following monetary transactions to Dubai, which were then subsequently sent by Havala to Iran through the black market:

- $50,016.14 on June 29, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Middle East Bank Ltd Dubai (# PNC034844MEBL)

33

- $50,016.13 on July 7, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Middle East Bank Ltd Main Branch Dubai (# PNC035201MEBL)

- $27,022.59 on July 8, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Standard Chartered Bk Dubai Branch Dubai (# PNC035279CATB)

- $100,016.13 on July 10, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Middle East Bank Ltd Dubai (# PNC035365MEBL)

- $100,016.13 on July 14, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Middle East Branch Ltd Main Branch Dubai (# PNC035507MEBL)

- $36,016.13 on July 16, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Standard Chartered Bk Dubai Branch Dubai (# PNC035596CATB)

- $100,016.13 on July 21, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Middle East Bank Ltd Main Branch Dubai (# PNC035767MEBL)

- $1,315.13 on July 28, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Turkiye Is Bankasi As Foreign Dept Istanbul (# PNC034844MEBL)

- $100,016.13 on August 3, 1999 from The Hongkong and Shanghai Banking Corporation Limited to Middle East Bank Ltd Dubai (# PNC036384MEBL)

34

- $9,016.13 on August 6, 1999 from The Hongkong and Shanghai Banking
  Corporation Limited to Turkiye Emlak Bankasi As Corr Relations Div Istanbul
  (# PNC036559TKEB)

- $13,516.12 on September 4, 1999 from The Hongkong and Shanghai Banking
  Corporation Limited to Standard Chartered Bk Dubai Branch Dubai
  (# PNC037821CATB)

- $200,016.13 on September 30, 1999 from The Hongkong and Shanghai Banking
  Corporation Limited to Middle East Bank Ltd Main Branch Dubai
  (# PNC038958MEBL)

- $1,050,012.17 on October 25, 1999 from The Hongkong and Shanghai Banking
  Corporation Limited to Europaeisch-Iranische Handelsbank Hamburg
  (# PNC040103DIHB)

- $100,016.13 on November 6, 1999 from The Hongkong and Shanghai Banking
  Corporation Limited to Middle East Bank Ltd Main Branch Dubai
  (# PNC040699MEBL)

- $100,016.13 on November 27, 1999 from The Hongkong and Shanghai Banking
  Corporation Limited to Middle East Bank Ltd Main Branch Dubai
  (# PNC041688MEBL)

- $100,016.13 on December 17, 1999 from The Hongkong and Shanghai Banking
  Corporation Limited to Middle East Bank Ltd Dubai (# PNC042649MEBL)

- $80,016.13 on February 19, 2000 from The Hongkong and Shanghai Banking
  Corporation Limited to Middle East Bank Ltd Dubai (# PNC002073MEBL)

35

- $49,964 on March 15, 2000 from The Hongkong and Shanghai Banking
  Corporation Limited to Bank Tejarat Head Office Tehran (# PNC003232TEJA)

- $50,041 on March 30, 2000 from The Hongkong and Shanghai Banking
  Corporation Limited to Bank Tejarat Head Office Tehran (# PNC004030TEJA)

- 25,019.27 on June 20, 2000 from The Hongkong and Shanghai Banking
  Corporation Limited to Middle East Bank Ltd Main Branch Dubai

  (# PNC007754MEBL)

- $12,334.16 on June 21, 2000 from The Hongkong and Shanghai Banking
  Corporation Limited to Bank Tejarat Head Office Tehran (# PNC007755TEJA)

- $29,990.15 on August 8, 2000 from The Hongkong and Shanghai Banking
  Corporation Limited to Bank Tejarat Head Office Tehran (# PNC010333TEJA)

**III. Travel in Aid of Racketeering.** Title 18 U.S.C. §1952

84. Whereby RICO defendants traveled in interstate or foreign commerce, and used facilities in interstate and foreign commerce, including the mail, with the intent to distribute the proceeds of unlawful activity, and to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity, by and through their shell corporation, and thereafter performed or attempted to perform such unlawful activity.

85. Plaintiff further alleges that travel documents and correspondences between RICO defendants and their agents show that RICO defendants facilitated and furthered the commission of the RICO primary contraventions alleged herein above by continually travelling, on a frequent basis, from the United States to

36

Iran, Hong Kong, Philippines, Turkey and the United Arab Emirates for purposes of furthering their unlawful activity.

**IV. Federal Mail Fraud.** Title 18 U.S.C. §1341

86. Whereby RICO defendants devised a scheme or artifice to defraud, and/or obtain money or property by means of false or fraudulent pretenses, representations, or promises, and thus used the mails to send or deliver matters or things for the purpose of executing such scheme or artifice.

87. Plaintiff further alleges that the RICO defendants facilitated and furthered the commission of the RICO primary contraventions alleged herein above by the following acts:

- RICO defendants drafted proposals for exploitation rights (as is evidenced in the December 9, 1998 email), which was to be used by KEL for purposes of obtaining such rights. These documents were mailed to local KEL agents by RICO defendants outlining instructions on what should be done and how. After RICO defendants found out that foreign companies could not obtain rights to exploitation, SSL was created and thus the proposals were subsequently used and submitted on behalf of SSL (the shell corporation). In the proposal, under section "B-Part Two: Specific Conditions," RICO defendants promised that in return for harvesting rights they would "[t]rain three personnel introduced by Shilat in the subject of harvesting and processing of Artemia Cysts." However, in a subsequent email dated October 18, 1999 from Mark Lamon to Robert Goe, Mark states, "Regarding the 3 guys that we have to train this year from Shilat...put them to work helping with spotting from the plane...if they only know this part of the

37

business, they will not be able to do that much ...This might be a way to hide information from them...We probably cannot stop them from learning everything anyway. But, we can try to delay this happening." Thus, showing that RICO defendants had no intention to carry out what they had promised in the proposal, but instead used it as false pretenses as a means of leverage.

• RICO defendants also used the mails to send original copies of documentation along with fraudulent documentation and paperwork that would be needed to establish the Iranian companies and thus execute their fraudulent activities. This fact is also documented in the aforementioned email, whereby Mark states, "Let me know which of these documents you will need as originals. I can send them to Turkey by FedEX or UPS." In order for these documents to be submitted, they required signatures of those that RICO defendants had assigned as "management" since they did not want Simon Goe to personally sign anything. This was done for purposes of executing their scheme while also protecting Simon Goe from any association and or liability. Several documents including the "Brine Shrimp Biomass Proposal" specifically state, "Should Simon's name and signature be there? He is a US citizen. I recommend that Ihsan sign this with his power of attorney."

**V. Federal Wire Fraud.** Title 18 U.S.C. §1343

88. Whereby RICO defendants devised a scheme or artifice to defraud, and/or obtain money or property by means of false or fraudulent pretenses, representations, or promises, and thus transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign

38

commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing such scheme or artifice.

89.     Plaintiff further alleges that the RICO defendants facilitated and furthered the commission of the RICO primary contraventions alleged herein above by corresponding and communicating with one another through the use of emails and faxes.

90.     The majority of the orders given by RICO defendants to other employees and agents was done via email and fax, a majority of which we have in our possession. These communications specifically spell out instructions pertaining to every aspect of the scheme and the intentions of the RICO defendants to defraud. Specific details such as who should do what, how and when are discussed in these communications.

## VI. Federal Criminally Derived Property. 18 U.S.C. § 1957

91.     Whereby the RICO defendants knowingly engaged in or attempted to engage in monetary transactions in criminally derived property having a value greater than $10,000, derived from specified unlawful activity. These transactions took part either in the United States or outside of the United States with RICO defendants, defined pursuant to section 3077 of this title, as United States persons.

92.     The RICO defendants engaged in monetary transactions, including deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, involving funds or monetary instruments by, through, or to financial institutions.

## VII. Conspiracy to Commit all Predicate Acts. 18 U.S.C. § 1956(h)

93.     The RICO defendants by and through their actions and conduct adopted the common purpose of the conspiracy and participated in its commission. The goal of the conspiracy was to establish a shell corporation and to obtain exploitation rights through that company for the benefit of the Artemia enterprise in a manner to avoid detection and prosecution.

94.     At various times and places, all RICO defendants did conspire to acquire and maintain an interest and to further conduct and participate in the RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).

95.     The RICO defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts and did in fact commit two (2) or more of the offenses in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, in violation of 18 U.S.C. 1962.

## *C. RICO 18 U.S.C.A. §1962 (a), (b), and (c) Enterprise*

96.     Plaintiff alleges that the RICO defendants were employed by and associated with each other, and engaged in designing, formulating, establishing, implementing, and executing plans and conduct that constitutes a RICO pattern of racketeering activity.

97.     Plaintiff further alleges that RICO defendants were knowledgeable and aware of the activities of these RICO enterprises, and that said RICO persons and RICO defendants facilitated and furthered the RICO conspiracies alleged herein.

40

98.    Plaintiff further alleges that Simon Goe, Robert Goe, Mark Lamon, Sanders Brine Shrimp Company L.C., Ocean Star International Inc., and OSI Marine Lab Inc., constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, and/or representatives that formulate, design, and implement policies relative to the promoting, soliciting, advancing and/or otherwise operating a shell business organization for the purpose of submitting and obtaining a bid for the exploitation rights of Lake Urumia in Iran.

99.    The aforementioned RICO enterprise intentionally created an Iranian shell company in order to help assure its chances of obtaining exploitation rights within Iran, since bids and proposals were not being accepted by non-Iranian entities. The RICO enterprise aggressively promoted the Iranian shell company as a legitimate company with the means to handle such a venture, with the sole intent to use the shell company as a strategic front for the RICO enterprise, which would be the actual beneficiary of the scheme.

## *D. RICO Recovery*

100.    Pursuant to Title 18 United States Code § 1964(c), plaintiff is entitled to recover treble damages against the RICO defendants, jointly and severally, in an amount to be determined at tRial. Plaintiff is also entitled to recover for the costs of this litigation, including reasonable attorney's fees.

41

## IV. SECOND CLAIM FOR RELIEF:

### For RICO Aiding and Abetting Primary Contravention of RICO Sections 1962(b) of the Racketeer Influenced and Corrupt Organizations Act of 1970 [Against All Defendants]

101.    Plaintiff repeats, re-alleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein and further allege:

102.    Plaintiff alleges that RICO defendants employed the federal mails and/or federal interstate wires, as well as engaged in racketeering activity as alleged herein, to aid and abet the primary RICO § 1962(b) contraventions committed by each defendant.

### *RICO Recovery*

103.    Pursuant to Title 18 United States Code § 1964(c), plaintiff is entitled to recover treble damages against the RICO defendants, jointly and severally, in an amount to be determined at tRial. Plaintiff is also entitled to recover for the costs of this litigation, including reasonable attorney's fees.

## II. THIRD CLAIM FOR RELIEF:

### For Commission of Primary Contravention of RICO Section 1962 (c) of the Racketeer Influenced and Corrupt Organizations Act of 1970] ["RICO"] [Title 18 United States Code §§1962(c) [Against All Defendants]

104.    Plaintiff repeats, re-alleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein and further allege:

42

105.    That the RICO Defendants are (a) persons (b) employed by or associated with (c) an enterprise (d) that is engaged in or affects interstate or foreign commerce (e) conducted or participated in the conduct of the enterprise's affairs (f) through a pattern of racketeering activity (g) while acting with the necessary mens rea (h) resulting in injury to the plaintiff's business or property.

106.    At all relevant times, the RICO defendants participated in the operation or management of an "enterprise," within the meaning of 18 U.S.C. § 1961(4). The RICO defendants, operating together and individually, directed and controlled the Artemia Enterprise.

107.    The RICO defendants operated, managed, and exercised control over the Artemia enterprise by establishing a shell corporation, hiring individuals to carry out orders given by RICO defendants, laundering money to and from Iran, using the laundered money to pay agents of the shell corporation, continued the scheme in which the coconspirators facilitated the money-laundering scheme and concealed and remitted to the RICO defendants the proceeds of the money-laundering scheme; (b) compelling their customers to sell cigarettes at prices set by the RJR DEFENDANTS; and (c) investing and using the proceeds of the money-laundering scheme in the enterprise.

108.    As a direct and proximate result of the violations set forth above, the Plaintiff, has been injured in his business and property as set forth more fully in aforementioned paragraphs.

*RICO Recovery*

109. Pursuant to Title 18 United States Code § 1964(c), plaintiff is entitled to recover treble damages against the RICO defendants, jointly and severally, in an amount to be determined at tRial. Plaintiff is also entitled to recover for the costs of this litigation, including reasonable attorney's fees.

## IV. FOURTH CLAIM FOR RELIEF:

### For RICO Aiding and Abetting Primary Contravention of RICO Sections 1962(c) of the Racketeer Influenced and Corrupt Organizations Act of 1970 [Against All Defendants]

110. Plaintiff repeats, re-alleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein and further allege:

111. Plaintiff alleges that RICO defendants employed the federal mails and/or federal interstate wires, as well as engaged in racketeering activity as alleged herein, to aid and abet the primary RICO § 1962(c) contraventions committed by each defendant.

### *RICO Recovery*

112. Pursuant to Title 18 United States Code § 1964(c), plaintiff is entitled to recover treble damages against the RICO defendants, jointly and severally, in an amount to be determined at tRial. Plaintiff is also entitled to recover for the costs of this litigation, including reasonable attorney's fees.

## III. FIFTH CLAIM FOR RELIEF:

44

**For Commission of Primary Contravention of RICO Section 1962 (d) of the Racketeer Influenced and Corrupt Organizations Act of 1970] ["RICO"] [Title 18 United States Code §§1962(d) [Against All Defendants]**

113.   Plaintiff repeats, re-alleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein and further allege:

114.   That the RICO defendants are (a) persons that (b) conspired to violate section 1962 (c) thus causing injury to the plaintiff's business or property (d) by reason of (e) overt predicate acts.

115.   Plaintiff alleges that on or about the summer of 1999, and during all times material herein, the RICO defendants mutually agreed to enter into an agreement with each other  and to join and engage in the aforementioned racketeering activities and thus conspire to violate 18 U.S.C. §§ 1962(b), and 1962(c). RICO defendants entered and engaged in such an agreement with the knowledge that such acts were a part of a racketeering scheme, and that the objective of that mutual agreement was to destroy plaintiffs' interests in business and/or property, thus constituting contravention of RICO Section 1962(d).

116.   The purpose of the conspiracy was to acquire exploitation rights for the harvesting of Artemia in Lake Urumia in Iran. The RICO defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled the RICO defendants of the Artemia Enterprise to establish, control, manage  a shell company in which RICO defendants could then harvest artemia,

45

manufacture and distribute to enhance its market share, suppress its competition, and promote sale of its products.

117. The conspirators carried out the scheme, to serve a common purpose, knowing the impact of each member's role in furthering the overall scheme and nature of the conspiracy. Thus imputing the acts of each member to the others and holding each subject to common responsibility.

## *RICO Recovery*

118. Pursuant to Title 18 United States Code § 1964(c), plaintiff is entitled to recover treble damages against the RICO defendants, jointly and severally, in an amount to be determined at tRial. Plaintiff is also entitled to recover for the costs of this litigation, including reasonable attorney's fees.

## IV. SIXTH CLAIM FOR RELIEF:

## For RICO Aiding and Abetting Primary Contravention of RICO Sections 1962(d), Conspiracy Contravention of RICO Sections 1962(b) and (c) [Against All Defendants]

119. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein and further allege:

120. That the RICO defendants employed the federal mails and/or federal interstate wires, as well as engaged in racketeering activity as alleged herein, to aid and abet the primary RICO §§ 1962(b) and (c) contraventions committed by each defendant.

46

121.     The RICO defendants substantially assisted in the commission of and were aware of the commission of the primary RICO contraventions committed by each and every one of them.

122.     Defendants were members of the RICO conspiracy at all times during the period of time in which the fraudulent activities were being committed, constituting the RICO pattern of racketeering activity.

## *RICO Recovery*

123.     Pursuant to Title 18 United States Code § 1964(c), plaintiff is entitled to recover treble damages against the RICO defendants, jointly and severally, in an amount to be determined at tRial. Plaintiff is also entitled to recover for the costs of this litigation, including reasonable attorney's fees.

## **JURY DEMAND**

Plaintiffs demand trial by jury as to all facts and issues raised in this Complaint.

Respectfully submitted

Herischi & Associates LLC

By:

Ali Herischi (*Ad Hoc Vice*)
Herischi & Associates LLC
7201 Wisconsin Ave, Suite 450
Bethesda, MD 20814
Email: ali.herischi@ibhlaw.com

Tel: 301-363-4540
Fax: 301-363-4538
*Attorney for Plaintiffs*

By: _____

Joshua A. Ridless
The Law Offices of Joshua A.
Ridless, P.C.
244 California Street, Suite 300
San Francisco, CA 94111
Tel: 415-614-2600
*Local Attorney*

48

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Massoud Bassidji | Ocean Star International, Inc., et. al. |

| (b) County of Residence of First Listed Plaintiff   Non-US Resident | County of Residence of First Listed Defendant   San Mateo County, CA |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joshua A. Ridless (local counsel)
The Law Office of Joshua A. Ridless, P.C., 244 California St., Suite 300,
San Francisco, CA 94111(Phone # 415-614-2600)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| ❑ 1  U.S. Government Plaintiff | ❑ 3  Federal Question *(U.S. Government Not a Party)* |
| ❑ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ❑ 4 | ☒ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated *and* Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❑ 625 Drug Related Seizure of Property 21 USC 881 | ❑ 422 Appeal 28 USC 158 | ❑ 375 False Claims Act |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 365 Personal Injury - | ❑ 690 Other | ❑ 423 Withdrawal 28 USC 157 | ❑ 400 State Reapportionment |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability | Product Liability | | | ❑ 410 Antitrust |
| ❑ 140 Negotiable Instrument | | ❑ 367 Health Care/ | | **PROPERTY RIGHTS** | ❑ 430 Banks and Banking |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | ❑ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ❑ 820 Copyrights | ❑ 450 Commerce |
| ❑ 151 Medicare Act | ❑ 330 Federal Employers' Liability | Product Liability | | ❑ 830 Patent | ❑ 460 Deportation |
| ❑ 152 Recovery of Defaulted Student Loans | ❑ 340 Marine | ❑ 368 Asbestos Personal Injury Product | | ❑ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| (Excl. Veterans) | ❑ 345 Marine Product Liability | Liability | **LABOR** | **SOCIAL SECURITY** | ❑ 480 Consumer Credit |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 350 Motor Vehicle | **PERSONAL PROPERTY** | ❑ 710 Fair Labor Standards Act | ❑ 861 HIA (1395ff) | ❑ 490 Cable/Sat TV |
| ❑ 160 Stockholders' Suits | ❑ 355 Motor Vehicle Product Liability | ❑ 370 Other Fraud | ❑ 720 Labor/Mgmt. Relations | ❑ 862 Black Lung (923) | ❑ 850 Securities/Commodities/ Exchange |
| ❑ 190 Other Contract | ❑ 360 Other Personal | ❑ 371 Truth in Lending | ❑ 740 Railway Labor Act | ❑ 863 DIWC/DIWW (405(g)) | ❑ 890 Other Statutory Actions |
| ❑ 195 Contract Product Liability | Injury | ❑ 380 Other Personal Property Damage | ❑ 751 Family and Medical Leave Act | ❑ 864 SSID Title XVI | ❑ 891 Agricultural Acts |
| ❑ 196 Franchise | ❑ 362 Personal Injury - Med. Malpractice | ❑ 385 Property Damage Product Liability | ❑ 790 Other Labor Litigation | ❑ 865 RSI (405(g)) | ❑ 893 Environmental Matters |
| | | | ❑ 791 Empl. Ret. Inc. | | ❑ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Security Act | **FEDERAL TAX SUITS** | ❑ 896 Arbitration |
| ❑ 210 Land Condemnation | ❑ 440 Other Civil Rights | ❑ 510 Motions to Vacate | | ❑ 870 Taxes (U.S. Plaintiff | ❑ 899 Administrative Procedure |
| ❑ 220 Foreclosure | ❑ 441 Voting | Sentence | | or Defendant) | Act/Review or Appeal of |
| ❑ 230 Rent Lease & Ejectment | ❑ 442 Employment | **Habeas Corpus:** | | ❑ 871 IRS—Third Party | Agency Decision |
| ❑ 240 Torts to Land | ❑ 443 Housing/ | ❑ 530 General | | 26 USC 7609 | ❑ 950 Constitutionality of |
| ❑ 245 Tort Product Liability | Accommodations | ❑ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| ❑ 290 All Other Real Property | ❑ 445 Amer. w/Disabilities - Employment | ❑ 540 Mandamus & Other | ❑ 462 Naturalization Application | | |
| | ❑ 446 Amer. w/Disabilities - Other | ❑ 550 Civil Rights | ❑ 463 Habeas Corpus - | | |
| | ❑ 448 Education | ❑ 555 Prison Condition | Alien Detainee | | |
| | | ❑ 560 Civil Detainee - Conditions of Confinement | (Prisoner Petition) | | |
| | | | ❑ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ❑ 2 Removed from State Court   ❑ 3 Remanded from Appellate Court   ❑ 4 Reinstated or Reopened   ❑ 5 Transferred from another district *(specify)*   ❑ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1961–1968
Brief description of cause:
Defendants committed acts of racketeering by violating different US laws as defined under 18 USC § 1961–1968.

## VII. REQUESTED IN COMPLAINT:

❑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   T8D > 9,999,999.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❑ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE  10/26/11

SIGNATURE OF ATTORNEY OF RECORD   Joshua A. Ridless 195413

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____